In the Matter of **BLACK RANCHES, INC.**, a Nebraska Corporation, Debtor.

**Roe R. BLACK, Avis C. Black, Roe C. Black, Black Ranches, Inc.**, a Corporation, Debtor, and **Thomas Hart Fisher,** Appellants,

v.

**Anna C. BRANDO** as Administratrix of the Estate of Marlon Brando, Sr., and Marlon Brando, Jr., Appellees.

**Marlon BRANDO, Jr.,** Appellant,

v.

**Roe R. BLACK, Avis C. Black, Roe C. Black, Fred M. Nicholson,** doing business as LaVernia Feed and Grain, **R. D. Brown, R. A. Culpepper** and **G. W. Parker,** a co-partnership, doing business as Veterinary Service Institute, **Black Ranches, Inc.**, a corporation, and **Thomas Hart Fisher,** Appellees.

Nos. 17991, 17993.

United States Court of Appeals Eighth Circuit.

May 12, 1966.

Motions to Amend and Petition for Rehearing Denied June 21, 1966.

Thomas Hart Fisher, Chicago, Ill., made argument for Roe R. Black, and others, and filed brief with E. H. Powell, Aurora, Neb.

Norma Vermaas, Lincoln, Neb., for Anna C. Brando, and others.

Before MATTHES and GIBSON, Circuit Judges, and HUNTER, District Judge.

MATTHES, Circuit Judge.

These are two of the series of four appeals in the Black Ranches, Inc. Chapter X reorganization proceeding.

Before proceeding further, we are constrained to state the reason for the undue length of this opinion. The style of the opinion indicating two appeals is misleading. Eight distinct claims, which have given rise to numerous controversies, are involved and each of these claims constitutes, in effect, a separate appeal.

In case No. 17,991, appellants have appealed from the orders allowing: (a) claim No. 16, in favor of Marlon Brando, in the amount of $3,500; (b) claim No. 17, in favor of Marlon Brando, Jr., in

the amount of $3,289.02; (c) claim No. 21, in favor of Marlon Brando, Jr., in the amount of $14,372.58; (d) claim No. 22, in favor of Marlon Brando, Jr., in the amount of $86,257.62; and (e) claim No. 23, in favor of Marlon Brando, in the amount of $2,698.18. All were allowed as general and unsecured claims.[1]

In case No. 17,993, Marlon Brando, Jr. has appealed from: (a) the order denying his claim No. 22 the status of a secured claim; (b) the order disallowing his claim No. 19, in the amount of $50,-000; (c) the order disallowing his claim No. 20, in the amount of $17,500; (d) the order allowing claim No. 12 of Roe R. Black and claim No. 13 of Thomas Hart Fisher, Black's assignee, in the total amount of $78,641.75; and (e) the order refusing to subordinate claims Nos. 12 and 13 to any and all claims of Marlon Brando, Jr.

All of the presently contested claims emanate from complex facts having their setting in Black Ranches' distressed financial plight, which developed shortly after debtor's organization in 1949 and continued until this proceeding was instituted in 1954. The background facts discussed in appeal No. 17,990 (Black et al. v. Strand et al., 8 Cir., 362 F.2d 8) and additional operative facts particularly apropos to these appeals and to appeal No. 17,992 (Black et al. v. Denver United States National Bank, 8 Cir., 362 F.2d 38) aid a more comprehensive understanding of the numerous questions presented for our determination.

Roe R. and Avis C. Black, husband and wife, are the parents of Roe C. Black, who is also a party to all of the appeals.[2]

Roe R. Black and John M. Palmer have been acquaintances since 1930. They ventured into the cattle ranching business in 1947. From this beginning Black's ranching enterprise, consisting principally of providing pasture and care for cattle belonging to other parties, expanded until, in 1949, Black Ranches came into existence.

Marlon Brando was the father of Marlon Brando, Jr.[3] The latter was, during all relevant times, an actor in the motion picture industry. Penny Poke Ranch, Inc., was a corporation whose capital stock was owned by Brando, Jr. Apparently, Brando, Jr.'s ranching enterprise was pursued, in part, through this corporation. In 1948, Marlon Brando, Jr. decided to invest some of his available funds in the establishment of a breeding herd of cattle. That same year, cattle, constituting the beginning of what later became known as the "Penny Poke" herd, were acquired for him by his father. Pursuant to contractual arrangement, this "Penny Poke" herd, indisputably owned by Brando, Jr., eventually was kept and grazed on Black Ranches land.

On July 26, 1950, Brando, Jr. executed a power of attorney wherein he constituted his father his attorney in fact. Pursuant to that authority, Marlon Brando represented his son in the many transactions involved in this litigation.

Jean A. Cobbey is a lawyer. He has been an acquaintance of John M. Palmer for many years and of Roe R. Black since 1948. Cobbey organized Black Ranches, Inc. at the behest of Palmer and Black. Cobbey was the attorney for Black Ranches for some time after its organization. Although he and Palmer were also directors and officers of the company for less than two years, Cobbey remained closely associated with Roe R. Black and Black Ranches.

1. Hereinafter, our use of the name "Brando" shall, unless otherwise indicated, refer to Marlon Brando. Black Ranches, Inc., the debtor corporation, will be referred to as "Black Ranches," "debtor" or "corporation".

2. Roe C. Black has had a claim allowed in the sum of $2,027.14. LaVernia Feed and Grain and Veterinary Service Institute, appellees in No. 17,993, are holders of allowed claims for $1,004.78 and $1,186.84, respectively.

3. Marlon Brando's death on July 17, 1965, has been suggested, and Anna C. Brando, "Administratrix of the Estate of Marlon Brando, Sr." has been substituted as a party in the proceedings in this court.

## CLAIM NO. 22

In No. 17,991, appellants challenge the court's allowance of this claim in any amount, whereas, in No. 17,993, Brando, Jr. not only seeks to uphold the allowance, but contends that the court erred in not granting it the status of a secured claim.

The claim was based upon two promissory notes executed by Black Ranches, pursuant to the authority of its board of directors. One note, for $40,742.41, was dated October 1, 1952, payable to Brando, Jr. two years from date, and bore interest at six per cent per annum from date until maturity, and eight per cent per annum from maturity. This note was secured by a real estate mortgage of same date on the ranch land of debtor. The second note, dated July 2, 1953, for $36,761.01, was payable to Brando, Jr. two years after date, with interest from date at six per cent per annum until maturity, and eight per cent per annum thereafter. This note was also secured by a real estate mortgage on the ranch land of debtor. Thus, Brando, Jr. held third and fourth mortgages on the land (Union National and Sack held first and second mortgages. See, appeal 17,990). The District Court of Brown County, Nebraska, in the proceeding instituted by Union National, decreed that Brando, Jr. was the owner of the third and fourth mortgage liens upon the ranch land and further decreed foreclosure, as provided by law. Although Judge Delehant allowed claim No. 22 in the total sum of $86,257.62, which included the principal amount of the notes and accumulated interest to October 22, 1954, he declined to recognize the mortgages as valid liens, and consequently accorded the claim general and unsecured status. Neither of the parties is satisfied with the result.

### A. APPEAL NO. 17,991.

In appeal No. 17,991, appellants assert that there is included, as a part of the allowance, the sum of $37,814.16 (with interest) on account of "winter feed expenses", and they contend this amount was incurred in caring for cattle owned by Penny Poke Ranch, the Brandos and other persons, was paid directly to third persons, and that debtor was in no way liable for this amount.

Manifestly, appellants' defense raised an issue of fact, which has been resolved against them. We unhesitatingly conclude that appellants have not sustained the burden of demonstrating that the court's findings (presumptively correct) are clearly erroneous.

To state the various facets of appellants' attack or to detail the pertinent evidence even superficially, would unnecessarily overburden this opinion. However, it is confidently stated that appellants' arguments have been examined and found lacking in factual support. Without further discussion, we dispose of the point by concurring in Judge Delehant's finding that:

"The whole evidence * * * convinces * * * that the full sum of $77,503.42, represented in the two notes * * * was by Marlon Brando, Jr., the claimant, advanced and loaned to Black Ranches, Inc. in aid of the latter's operation of its business, and in varying amounts and at different times prior to the execution of the several notes. The objectors are quite unrealistic in their assertion that Marlon Brando, Jr. loaned or advanced the entire sum * * * to Marlon Brando, who thereupon applied it on his own account to the expenses of Black Ranches, Inc. * * *" The advancements "were expressly made for and in behalf of Marlon Brando, Jr. with the complete awareness of their source on the part of Black Ranches, Inc., and of no one in its behalf more surely than Roe R. Black. In that phase of the corporation's operations, Roe R. Black not only welcomed, but cultivated, the younger Brando as a very real, and probably the most promising, source of financial assistance in a persisting economic crisis. Marlon Brando, Jr., as has already been observed, was then in affluent circumstances, thanks to his profitable employment

in his theatrical calling. No one else connected with Blanck Ranches, Inc. was even comparably as well circumstanced in a financial way."

■ Appellants next assert that the two promissory notes to Brando, Jr. "were invalid because they were issued by Debtor as a part of the fraudulent scheme of Brando and Cobbey to create fraudulent claims against Debtor in breach of their fiduciary obligations to Debtor." It is, perhaps, appropriate to recall basic legal principles applicable to resolution of this contention. Under normal circumstances, the law presumes good faith and honesty. As a corollary, the general rule is that fraud will not be presumed, but must be proved by the party asserting it. 24 Am.Jur., Fraud & Deceit, §§ 255–256; United States v. Wunderlich, 342 U.S. 98, 100, 72 S.Ct. 154, 96 L.Ed. 113 (1951); Lessmann v. C. I. R., 327 F.2d 990 (8 Cir. 1964); Reeves v. United States, 168 F.Supp. 720 (D.C.Neb. 1958).

Appellants enthusiastically state that Judge Delehant found "in the clearest possible terms that Cobbey and Brando had formulated in mid-April, 1952, a fraudulent scheme * * * for Brando's 'ultimate acquisition for the benefit of himself and Marlon Brando, Jr. of the ranching enterprise of Black Ranches, Inc., including, eventually, its ranch land and other property, and its operations in the way of "ranching cattle" ' ". The statement just quoted is, in large part, the product of the author of the brief and the quotes therein extracted from Judge Delehant's opinion were taken out of context. Appellants climax their assertions in regard to the claimed fraudulent scheme with the statement: "Thus Judge Delehant found IN SO MANY WORDS that the two notes in question, as well as the mortgages securing them, were made as part and parcel of the Brando-Cobbey fraudulent 'design' or 'project.' " Appellants do not cite us to the part of Judge Delehant's opinion where the last quoted avowed finding appears. The unvarnished fact is that Judge Delehant found (p. 263 of the printed record):

"Thus construed, the court holds that the notes themselves, and each of them, are invulnerable to the attack made upon them. The advancements underlying the several notes were made, supra. Thereby, the debt evidenced by each note was created. To borrow a celebrated phrase, Black Ranches, Inc. had 'hired the money.' *There was no illegality, wrongdoing, over-reaching or dishonesty in the giving of promissory notes evidencing the debts, and providing a later time for the payment of each note, and for the payment of lawful interest pending such payment.* Marlon Brando, Jr. might conceivably have grounds for complaint against Marlon Brando for the advancement of his funds for the benefit of Black Ranches, Inc. *But Black Ranches, Inc., having received the benefit of the advancement simply owed—and owes—the debt* resulting therefrom." (Emphasis supplied).

A brief résumé of the evidence upon which appellants rest their claim of a fraudulent scheme is pertinent at this point. Roe R. Black, Palmer and Cobbey constituted the first board of directors and the first president, vice-president and treasurer, and secretary, respectively, of Black Ranches.[4] They served in those capacities from October 13, 1949, until May 10, 1951, when, at a special meeting of the board of directors, Cobbey resigned as director and secretary, and Palmer resigned as vice-president and treasurer. Roe R. Black was then elected treasurer and retained his office as president. On December 15, 1951, Palmer resigned as director. As a consequence, Black was the sole remaining director, as well as president and treasurer of Black Ranches from December 15, 1951.

4. They were so designated at shareholders' and directors' meetings held on October 13, 1949.

In the early part of 1952, Black Ranches was confronted with pressing financial problems. The first and second mortgages, constituting liens in the principal amount of approximately $110,000, were in default. Denver National Bank, a large secured creditor, and other creditors were demanding payment or settlement of their claims. The corporation was without operating funds and Black, who, with his wife, owned all of the stock and was then the sole director and officer, was experiencing difficulty in obtaining additional financing for the corporation. Corporate bankruptcy seemed imminent. It was in this setting that Black turned to Cobbey for assistance in the early part of April, 1952. Cobbey in turn, enlisted the aid of Palmer and Brando. Thereafter, on about April 14, 1952, Roe R. and Avis C. Black executed and delivered to Cobbey transfers of all of their stock (as noted in our opinion in No. 17,990, the court found that Cobbey held the stock in trust); at about the same time Brando signified his willingness to assist Cobbey in the latter's attempt to rehabilitate and stabilize Black Ranches; on April 14, 1952, at a shareholders' meeting, Cobbey (then the sole holder of the stock), Brando and Palmer were elected as directors of the corporation. On the same day the directors elected Brando, Cobbey and Palmer as president, vice-president and treasurer, and secretary, respectively; on April 21, 1952, Cobbey and Brando executed an agreement, designated in the record as Exhibit 69;[5] after April 15, 1952, Brando acted both as president and as general manager of Black Ranches;[6] on April 7, 1953, Brando and Palmer were, at their request, relieved of their duties as directors and officers of the corporation.

Brando's entry into the picture and his subsequent efforts furnished temporary relief from the debtor's financial plight. A substantial amount of Brando, Jr.'s money was used to defray payments on the first and second mortgages. Through Brando, Jr.'s financial assistance Brando, then manager, was able to continue the ranch operations. In May, 1952, the Brandos also guaranteed payment of the Black Ranch debt to Denver United States National Bank. In short, Brando, Jr. proved to be a financial benefactor of the corporation, which, but for such aid, would probably have collapsed.

It is, of course, true that the note of October 22, 1952, given Brando, Jr., was executed by the corporation pursuant to authority of the board of which Brando was a member, at a time when he was also president and general manager. Brando was, at the same time, acting as attorney in fact for his son pur-

---

5. This agreement recited that Brando was one of the corporation's principal creditors; that Cobbey held the stock of the corporation for the purpose of conserving its assets; that if the debts of the corporation were paid in full by April 15, 1954, through the efforts of Roe R. Black, he would receive 51% of the stock and Brando 49% thereof; that if the debts were paid by April 15, 1955, through the efforts of Black or Brando, Brando would receive 51% and Black 49% of the stock; that if debts were settled "to the total amount of $230,000" Cobbey would give from 51% to 100% of the stock to Brando, or to such persons as agreed upon by Cobbey, Brando and Palmer. Brando agreed to devote the major portion of his time to Black Ranches; to bend every effort to the refinancing of the mortgage indebtedness; to retire the corporation's bank indebtedness; and to conduct the affairs of the corporation in a profitable manner. The parties further agreed that, for the purposes of the contract, the value of the ranch was $230,000. There was a final provision that, if the mortgage indebtedness was not refinanced, the general creditors held in abeyance, and expenses kept current after April 15, 1952, the agreement would be void. Judge Delehant found that the agreement was never carried into effect, either entirely or in part, and that late in June or early July, 1953, Cobbey and Brando agreed that, "because of its inoperability", it be wholly abandoned. The Judge, nevertheless, considered the agreement in determining the legal effect of the mortgages given to secure claim No. 22.

6. Brando continued as manager of Black Ranches until January 1, 1955, when he resigned.

suant to the power of attorney, supra. The second note of July 2, 1953, given Brando, Jr. was executed pursuant to authority of the board, which was then composed of Cobbey and two of his office associates. It is also true that Judge Delehant refused to accord validity to the third and fourth mortgages given by the corporation as security for the two notes, because of a breach of Brando's fiduciary responsibilities. But, contrary to appellants' contention, such factors do not *compel* invalidation of the notes.

█ Not only did the notes constitute prima facie obligations of the corporation, but Judge Delehant found "that the debts for which the two notes involved in claim No. 22 were given, were and are validly created for good and full consideration, and constitute lawful obligations of Black Ranches, Inc., for which the giving of the notes alone was and is uncensurable and valid." As the reviewing court, we are not at liberty to set aside the court's finding as "clearly erroneous", unless, on consideration of the entire evidence we are left with the definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). We are not so convinced.

Appellants advance other reasons to support their proposition that the claim should not have been allowed in any amount. Thus, they argue that the Brando-Cobbey contract of April 21, 1952, Exhibit No. 69 (supra), was a third-party contract under which Brando personally agreed to hold debtor harmless from all sums thereafter expended by the Brandos in conducting cattle ranching operations. They also contend that the notes are invalid because they were given for a past consideration, at times when debtor was insolvent. These, and other attacks upon claim No. 22, were considered at length by Judge Delehant, who ruled, in effect, that the claim was invulnerable to all assaults. We too have pondered all questions raised by appellants and are convinced that Judge Delehant reached a proper result in allowing

the claim, and we affirm his order in that respect.

### B. APPEAL NO. 17,993.

Brando, Jr. contends that the district court erred in failing to allow his claim No. 22, as a secured claim, prior to all other claims except claim No. 5. The crucial question is whether the third and fourth mortgages, given to Brando, Jr. as security for the notes, constituted enforceable liens upon the debtor's property.

Characteristically, the court meticulously analyzed the facts and circumstances surrounding the giving of these mortgages. Judge Delehant pinpointed the undisputed evidence showing: (a) the financial plight of debtor in April, 1952, and thereafter; (b) Cobbey's holding, as trustee, of all of the stock; (c) the personnel of the board and the corporate officers after April, 1952, (Cobbey, Brando and Palmer, directors—Brando, president and manager); (d) the agreement between Cobbey and Brando (Exhibit 69, supra); (e) the status on October 1, 1952, and on October 22, 1952, of Brando as director, president and manager, and the status of Brando as manager on July 2, 1953; (f) Brando's "entertainment and his discussion * * of an imprecise project for the eventual 'taking over' for himself and Marlon Brando, Jr. of the property and operations of Black Ranches, Inc." and Cobbey's knowledge of that contemplated project; and (g) the directors' meeting on October 22, 1952, and July 2, 1953, directing the execution of the mortgages.

After adverting to the foregoing significant circumstances, and "especially the trust and confidence reposed in, and the responsibilities by law imposed upon, J. A. Cobbey and Marlon Brando, in favor, and for the benefit, of all of the creditors, secured and unsecured, and also for the benefit of the equitable owners of the capital stock, of Black Ranches, Inc.," the court found that the action taken by the corporate directors and officers, "in approving and directing the execution and delivery and in the ensuing actual execution and delivery, of

the third mortgage under date of October 1, 1952, and of the fourth mortgage under date of July 2, 1953, and each item of such action, constituted, and was taken, in violation of the trust and confidence, and of the fiduciary duties, by law imposed upon such directors and officers. And to that extent, the court finds and concludes that such action was and is invalid and ineffective."

Judge Delehant expanded upon the foregoing conclusions by observing that: "They [Cobbey and Brando] were obliged to recognize and respect priorities as between creditors that had validly and inflexibly attached; but it was beyond their right to create priorities as between creditors with a manifest view to the preference of the recipients of such priorities. And the creation of such a priority was not alone the consequence, but also the inescapable purpose, of the execution of each of the two mortgages involved in Claim No. 22. * * They are likewise demonstrative of an attitude that is irreconcilable with the duties of a 'faithful steward.' "

Consideration was also accorded to Brando, Jr.'s argument that he had no "formal knowledge" of his father's course of conduct and should not be accountable therefor. The court's view was: "[h]owever, in this claim, Marlon Brando, Jr. is the moving party; he undertakes to hold fast to the position which his acknowledged agent attempted by the two mortgages to obtain for him. In that effort he must suffer the infirmities of the agent's conduct. What Marlon Brando did, Marlon Brando, Jr. must be held to have done."

Brando, Jr. contends that there is no evidence to bring the giving of the two mortgages within the contemplation of the rule which prohibits, under some circumstances, the giving of security to one in a fiduciary relationship. Cases from Nebraska state courts and other jurisdictions are relied upon. We do not regard such authorities as apposite.

■ It is firmly established that a reorganization court, as a court of bank-

ruptcy, has the jurisdiction and powers of a court of equity. 6 Collier on Bankruptcy, ¶ 317, p. 657, pertinently observes: "But § 115 [Chapter X Bankruptcy Act] gilds the lily further by providing:

" 'Upon the approval of a petition, the court shall have and may, in addition to the jurisdiction, powers, and duties hereinabove and elsewhere in this chapter conferred and imposed upon it, exercise all the powers, not inconsistent with the provisions of this chapter, which a court of the United States would have if it had appointed a receiver in equity of the property of the debtor on the ground of insolvency or inability to meet its debts as they matured.' "

This principle has judicial sanction. In the landmark case of Pepper v. Litton, 308 U.S. 295, 303, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939), the court stated:

"Courts of bankruptcy are constituted by §§ 1 and 2 of the bankruptcy act, 30 Stat. 544, 11 U.S.C.A. §§ 1(8), 11, and by the latter section are invested 'with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in bankruptcy proceedings.' Consequently this Court has held that for many purposes 'courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity'. * * * Among the granted powers are the allowance and disallowance of claims; the collection and distribution of the estates of bankrupts and the determination of controversies in relation thereto; the rejection in whole or in part 'according to the equities of the case' of claims previously allowed; and the entering of such judgments 'as may be necessary for the enforcement of the provisions' of the act."

See also, in re Keystone Realty Holding Company, 117 F.2d 1003, 1006, 133 A.L.R. 1378 (3 Cir. 1941).

■ It cannot be gainsaid that Brando and Cobbey, as directors and officers,

were fiduciaries. Pepper, supra, 308 U.S. at p. 306, 60 S.Ct. at p. 245, teaches: "A director is a fiduciary. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588, [23 L.Ed. 328]. So is a dominant or controlling stockholder or group of stockholders. Southern Pacific Co. v. Bogert, 250 U.S. 483, 492 [39 S.Ct. 533, 537, 63 L.Ed. 1099]. Their powers are powers in trust. See Jackson v. Ludeling, 21 Wall. 616, 624 [22 L.Ed. 492]. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein."

██ Regardless of the motives of Brando, the fact remains that his participation, as an officer of debtor, in the giving of the mortgages, must be scrutinized and judged by the standards stated, supra. So viewing the matter, we conclude that Judge Delehant reached a fair and just result, and his order denying claim No. 22 the status of a secured claim is affirmed.

### CLAIMS NOS. 16 AND 17
### APPEAL NO. 17,991

Brando sought allowance of claim No. 16 in the amount of $37,379.35, plus interest at six per cent, from July 1, 1954. The court allowed it in the amount of $3,500, as a general and unsecured claim. Brando, Jr.'s claim No. 17 was allowed in the sum of $3,289.02. Appellants seek reversal of both allowances.

Studious examination of the claims, objections thereto, the pertinent evidence, and the contentions of appellants satisfies us that Black Ranches owed both claimants the amounts allowed. We affirm, on the basis of the district court's opinion.

### CLAIM NO. 21
### APPEAL NO. 17,991

This claim was allowed as a general and unsecured claim in favor of Brando, Jr. in the sum of $14,372.58. Appellants advance numerous arguments to support their contention that the court's order should be reversed.

The operative facts are centered on transactions between: Roe R. Black, Black Ranches, and Denver United States National Bank (formerly Denver National Bank and hereinafter referred to as Denver Bank); and the Brandos, Penny Poke and the Denver Bank. (These facts also have relevance to appeal No. 17,992, Black et al. v. Denver United States National Bank, 8 Cir., 362 F.2d 38, decided contemporaneously). During the winter of 1950–51, Roe R. Black was engaged, individually, and on behalf of Black Ranches, in the acquiring, caring for, feeding and the sale of cattle owned, or ultimately to be owned, by other persons, under an arrangement whereby the owners were to bear the costs of such care and feeding. Lacking capital to finance the enterprise, Black succeeded, in early 1951, in establishing a line of credit for himself and Black Ranches with the Denver Bank. Pursuant to an arrangement, Black, individually, and as president of Black Ranches, signed a number of blank promissory notes and chattel mortgages and authorized the Denver Bank to complete execution of the instruments, as the requirements for money arose, by including the appropriate amounts in the notes and the number and description of the cattle in the chattel mortgages. From time to time, as the need arose, Denver Bank did complete the notes and chattel mortgages and simultaneously deposit in the account of Black Ranches, or disburse for its benefit, the amount represented by each note and chattel mortgage. No suggestion is made that Denver Bank, in any manner, violated any confidence reposed in it.

Between March 5, 1951, and May 10, 1951, Denver Bank had made advances to Black and Black Ranches (hereinafter sometimes collectively referred to as Black), totaling $176,983.31, and held Black's notes and chattel mortgages evidencing this indebtedness. All of the

notes and mortgages were to mature on January 2, 1952. On October 19, 1951, Denver Bank consolidated the amounts previously lent into one note and chattel mortgage and, in accordance with the agreement, used one of the blank notes and mortgages that had been previously executed. This note, in the principal sum of $192,222.68, provided for interest at six per cent per annum from date, and was composed of the following items:

| | |
|---|---|
| Prior principal advances, | $176,983.31 |
| Interest at six per cent from date of advances to October 19, 1951, | 5,489.37 |
| Cash advanced on October 9, 1951, to Black Ranches, | 9,750.00 |
| Total, .......... | $192,222.68 |

Subsequent payments reduced the principal amount due on this "consolidated" note to $126,144.70 as of April 1, 1952, which, with accrued interest, amounted to $130,763.06 then due Denver Bank.

Denver Bank also held two notes secured by chattel mortgages executed by the Brandos and Penny Poke Ranch, evidencing amounts borrowed for use in "Penny Poke" "cattle ranching" operations. The unpaid balance of the principal, on January 15, 1952, the maturity date, was $47,500. These two notes were in default and Denver Bank was pressing for their payment, as well as for payment of the balance due on the indebtedness of Black and Black Ranches. In order to prevent foreclosure of the Black chattel mortgages, which would probably have precipitated bankruptcy proceedings against Black Ranches, the Brandos and Penny Poke, on May 27, 1952, entered into an "Extension Agreement and Guaranty" with Denver Bank. In summary, the agreement provided: (1) Brandos and Penny Poke were indebted to Denver Bank in the sum of $47,500, with interest from January 15, 1952, evidenced by two notes and chattel mortgages on Brandos and Penny Poke livestock; (2) Black and Black Ranches were indebted to Denver Bank on April 1, 1952, in the amount of $130,763.06, with interest from that date at six per cent per annum, as evidenced by the October 19, 1951, note and chattel mortgage on livestock; (3) Brando had taken over the management of Black Ranches, under arrangement with Black and Black Ranches, for the purpose of operating it and liquidating its debts in an orderly manner; and Brandos and Penny Poke desired "the Bank to extend the maturities of, and to forbear from foreclosure of the security for, both the Black debt and the Penny Poke debt in order to permit the orderly liquidation thereof"; (4) Brandos and Penny Poke guaranteed payment at maturity of the balance due on October 19, 1951, on the Black note; (5) in case of default in payment at maturity of the Black note, Brandos and Penny Poke promised to pay the same; (6) to secure the performance "of this Guaranty" Brandos and Penny Poke "delivered, transferred, assigned and pledged" to Denver Bank by chattel mortgage "of even date herewith" all livestock owned by Penny Poke.

The Black note was not fully paid, and on February 1, 1955, Denver Bank instituted an action in the District Court of Lancaster County, Nebraska, against the Brandos and Penny Poke, on the guaranty agreement of May 27, 1952, and sought judgment for $23,861.43, alleged to be the balance of principal and interest due on the Black note. The suit was settled on December 1, 1955, by execution of a settlement agreement, and a note by the Brandos and Penny Poke payable to Denver Bank in the sum of $14,372.58, with interest from date at six per cent per annum. On March 1, 1956, and on May 3, 1956, Brando, Jr. made payments of $7,391.29 and $7,296.-89, respectively, (aggregating $14,688.-18 principal and interest due) to Denver Bank. The amount so paid liquidated the balance of the principal and a portion of the interest due on the Black note. Upon such payment Denver Bank delivered the Black note to Brando, Jr. for use in connection with filing of his claim No. 21.

The basic question for determination is the nature of Brando, Jr.'s obligation

to Denver Bank; i. e., whether he was, as contended by appellants, primarily responsible for the payment of the entire Black debt, or whether as contended by Brando, Jr. he was liable only as a guarantor, by virtue of the guaranty agreement.

The district court held that Brando, Jr.'s obligation stemmed from the guaranty agreement and that "his obligation was as a guarantor or surety for a debt, whose principal obligors were Roe R. Black and Black Ranches, Inc." Its holding was summed up in these words: "The contention that Marlon Brando, Jr. was the principal obligor for the debt of Roe R. Black and Black Ranches, Inc. to the Denver National Bank—or any part of it—is completely without merit or support".

■ The law of guaranty, in its general aspects, is set forth in 24 Am.Jur., Guaranty, § 2, in this language:

"The contract of guaranty is an undertaking or promise on the part of one person which is collateral to a primary or principal obligation on the part of another, and which binds the obligor to performance in the event of nonperformance by such other, the latter being bound to perform primarily. An approved definition of 'guaranty' is 'a promise to answer for the debt, default, or miscarriage of another person.' "

Accord: 38 C.J.S. Guaranty § 1; In re Williams' Estate, 148 Neb. 208, 26 N.W. 2d 847 (1947). Appellants' arguments, which have been fully explored, fail to persuade us that Marlon Brando, Jr. was primarily obligated at any time to pay the amount due Denver Bank on the Black note of October 19, 1951, executed by Black and Black Ranches. It defies logic to assert, as appellants in effect do, that Roe R. Black, individually, and for Black Ranches, was moved by altruism to obligate himself and his corporation, in an amount exceeding $192,000, for debts of the Brandos, Penny Poke and others. Quite to the contrary, as Judge Delehant found, Black was motivated to execute the note by the profits which he anticipated would result from the ranching enterprise. To be sure, the Brandos and Penny Poke had a stake in the maintenance of Black Ranches as an operative concern. But neither this factor nor others affected the respective legal responsibilities of the parties. Brando, Jr. was not legally bound to discharge any part of the Black debt until he executed the guaranty agreement which, by its clear and unequivocal terms, imposed upon him only the obligation to answer for the default of Black and Black Ranches.

■ Neither is the court's order allowing the claim invulnerable on the ground that the doctrine of subrogation does not apply.

"Subrogation is a salutary, equitable remedy, conceived in justice * * *. 'The doctrine * * * is not administered by courts of equity as a legal right, but the principle is applied to subserve the ends of justice, and to do equity in the particular case under consideration. It does not rest on contract, and no general rule can be laid down which will afford a test in all cases for its application. Whether the doctrine is applicable to any particular case depends upon the peculiar facts and circumstances of such case.' " Equitable Life Assur. Soc. of United States v. Person, 135 Neb. 800, 284 N.W. 260, 263–264 (Neb.1939).

See also, State ex rel. Spillman v. Citizens' State Bank, 118 Neb. 337, 224 N. W. 868 (1929). The doctrine may be invoked by the guarantor if the principal debtor has defaulted in the payment of his obligation and the creditor has enforced the contract of guaranty. The debtor's obligation to pay the debt is not extinguished by the guarantor's payment thereof. 24 Am.Jur., Guaranty, § 125, pp. 955–956. See, Howell v. Commissioner of Internal Revenue, 69 F.2d 447, 451 (8 Cir. 1934), cert. denied, 292 U.S. 654, 54 S.Ct. 864, 78 L.Ed. 1503.

■ We are mindful of appellants' submission that (a) the guaranty agreement did not provide for subrogation;

(b) Brando, Jr. was a mere volunteer; and (c) Brando "arranged the Penny Poke-Brando guaranty to further the Brando-Cobbey fraudulent scheme or 'project' to fleece debtor of its property". As previously stated, subrogation does not rest on contract. Contentions (b) and (c) are without factual support. We approve the court's action and affirm the allowance of claim No. 21.

### CLAIM NO. 23

 This claim of Marlon Brando was allowed in the amount of $2,698.18. The asserted consideration for the debt was the furnishing of repairs to buildings located upon debtor's real estate. In the foreclosure action (discussed in appeal No. 17,990, Black et al. v. Strand et al.), the District Court of Brown County, Nebraska, decreed that Brando held a mechanic's lien upon the buildings and real estate of debtor, as security for the amount due him, and was entitled to enforcement of the lien. After due consideration, Judge Delehant concluded that there was no evidentiary basis for according the claim preferred status and allowed it as a general unsecured claim.

The sole question before us is whether, as Judge Delehant found, Black Ranches was indebted to Brando. The controversy presented only a fact question. We have surveyed the evidence and are convinced that Judge Delehant's finding is supported by substantial evidence and is not clearly erroneous. The order is affirmed.

### SETOFFS AND COUNTER-CLAIMS TO BRANDO CLAIMS

Appellants assert that they are entitled to setoff against Brando claims 16, 17, 21, 22 and 23, the following: (1) additional grazing fees for grown Penny Poke cattle, of $1 per head per month from April, 1952, to September, 1955,

totaling $16,108.50; (2) grazing charges for "weaned" Penny Poke cattle from April, 1952, to September, 1955, at the rate of $4 per head per month, totaling $20,112; (3) grazing fees for 500 grown Brando cattle [7] from April, 1952, to September, 1955, at the rate of $4 per head per month, totaling $56,000; (4) grazing fees for weaned progeny of the 500 Brando cattle from April, 1952, to September, 1955, at the rate of $4 per head per month, totaling $6,888; (5) additional costs for winter feed for grown Penny Poke cattle from April, 1952, to September, 1955, totaling $10,998.61; (6) the cost of winter feed "for Brando's 500 cattle and the weaned progeny of both the Penny Poke and Brando 500 cattle" from April, 1952, to September, 1955, totaling $20,837.13; (7) "the profits and avails which Penny Poke Ranch, Inc., Marlon Brando, Jr., and Marlon Brando derived from grazing their cattle on Debtor's land between April 15, 1952, and September 15, 1955", totaling $131,834.73; (8) $21,261.22 of the "$62,500 purchase price of Brando's 500 cattle which debtor borrowed and later repaid Denver National Bank under Debtor's $192,222.68 chattel mortgage note"; and (9) any amount "Debtor may be required to pay Denver National Bank under claim No. 32", possibly totaling $7,488.90. The sum of debtor's claims on the setoffs is $291,529.09, with interest claimed at the rate of six per cent per annum.[8]

For their proposition that the first two-setoffs, supra, should be allowed, appellants rely primarily on a unanimously adopted corporate resolution of May 8, 1952, reading as follows: "that as of April 15, 1952, Penny Poke Ranch (a corporation whose capital stock was owned by Marlon Brando, Jr.) and Marlon Brando and Marlon Brando, Jr., shall pay Black Ranches, Inc. $4 per head per month for each weaned animal, plus any

---

7. "500 Brando cattle", or "Brando 500 cattle" refers to those cattle which were to be purchased by Black for Brando, in accordance with the contract dated July 26, 1950. This contract is more fully discussed, infra.

8. Apparently appellants have selected April, 1952, as the beginning date for grazing and feed charges (in the first seven claimed offsets) because Marlon Brando became manager of Black Ranches at that time.

additional feed Black Ranches, Inc. is required to purchase on behalf of said Penny Poke Ranch, Marlon Brando and Marlon Brando, Jr." In light of this resolution, appellants urge that Judge Delehant erred in not requiring that Brando pay debtor for Penny Poke cattle, both weaned and grown, at the rate of $4 per head per month from April 15, 1952, until September 15, 1955.

The evidence shows that Brando credited the debtor corporation for grazing fees for Penny Poke cattle at the rate of $3 per head per month. In their objections to Brando's claims, appellants alleged that the setoffs were due at the rate of $4 per head per month as "the fair market value of the care and feed furnished by the debtor corporation". The corporate resolution, now so strenuously urged upon us, was not relied upon as a basis for the offset, and Judge Delehant apparently viewed appellants' offset as based on a quantum meruit, rather than an express contract, theory. Having relied upon quantum meruit, appellants cannot now switch their primary reliance to the corporate resolution and, thereby, to an express contract theory. "It is elementary that on appeal the appellant must adhere to the theory on which the case was tried in the lower court". Kirk v. St. Joseph Stock Yard Co., 206 F.2d 283, 287, 40 A.L.R.2d 980 and cases cited (8 Cir. 1953). Judge Delehant found in regard to this offset: "The contention appears to be that such payments were not made, either at the rate of $4 per month per head (see corporate resolution, supra), or upon a basis resting on its regular and fair value. The court considers that position of the objectors not to have been established. It is true that something less than perfection characterizes the accounting with, and by, Black Ranches, Inc. as it is presented to the court, but that accounting fairly reflects a course of charges and credits on the score of such pasturage and care which persuades the court that Black Ranches, Inc. was not overreached in the respect asserted,

and that the Brando cattle were not accorded the status of 'freeloaders'."

In summary: (a) appellants sought recovery on the basis of the reasonable pasturage rental value, rather than on an express contract theory; (b) there was ample evidence that $3 per head per month was credited debtor for feed for the Penny Poke cattle; (c) and $3 per head per month was a reasonable credit reflecting the fair and reasonable value of the grazing privileges. Judge Delehant correctly denied this offset.

For the claimed offsets (3) and (4), supra, appellants rely upon the asserted fact that "Judge Delehant correctly held that Marlon Brando, Jr. owned 500 cattle which were grazed on Debtor's land". Appellants contend that Brando, as owner, is responsible for, and should bear the costs of, the feeding of the cattle. It is undisputed that the Brandos did not credit debtor for feed provided the 500 cattle and their weaned calves.

Judge Delehant never explicitly found that Marlon Brando, Jr. owned the 500 cattle. He merely found that "although the cattle were to be purchased for and in behalf of Marlon Brando, Jr." the "weight of the evidence is to the effect that in the interval of acquisition and transportation, the 'interim financing' was to be done by and in the name of Roe R. Black". Judge Delehant further found that Black mortgaged the cattle to Denver Bank, not only to secure their purchase price (as had been agreed upon between Brando and Black in their original contract discussed, supra), but also to secure and consolidate the indebtedness of the debtor corporation.

Beyond dispute, the parties to the July 26, 1950, contract, the subject of Brando, Jr.'s claim No. 19, infra, contemplated that: (1) Black would purchase 500 cattle for Brando, Jr.; (2) the purchase price would be paid by borrowed funds secured by a mortgage; (3) the cattle would become the property of Brando, Jr.; (4) Black would be obligated to defray all necessary expenses of

caring for the cattle until October 31, 1952, (not April 1952). It is just as certain that the parties did not contemplate that Black would convey the cattle by chattel mortgage to Denver Bank, in part to secure his and Black Ranches' primary indebtedness, which was consolidated on October 19, 1951, into one note amounting to $192,222.68. (See discussion, supra, re claim No. 21). Even if we accept appellants' theory that title had passed to Brando, Jr., mortgaging the cattle to secure his and Black Ranches' indebtedness amounted to nothing less than a conversion of the animals. From that point on, only Denver Bank, and, through it, the debtor, derived any benefits from these particular cattle, the proceeds of whose sales were all applied to discharge the indebtedness of Black and Black Ranches, Inc. Under the circumstances, it would be inequitable to require Brando, Jr. to pay the reasonable value of grazing cattle from which he derived nothing. We, therefore, concur in Judge Delehant's rejection of offsets (3) and (4), supra.

Appellants next contend that they are entitled to offset the costs of winter feed for weaned and grown Penny Poke and "Brando 500" cattle (offsets (5) and (6), supra). While there was conflicting evidence as to the amounts which should have been properly credited against debtor's total indebtedness to Brando, there is no cogent evidence in the record which conclusively established that the credit allowed debtor for winter feed expenses for the Penny Poke cattle was inadequate. Appellants have not discharged their burden of proof. With regard to the so-called "Brando 500 cattle", the same reasoning which defeated grazing offsets, supra, invalidates these asserted offsets.

In the court below, and on appeal here, appellants assert that they are entitled to a setoff for profits made by the Brandos while in possession of debtor's land from April, 1952, to September, 1955. Judge Delehant's denial of this setoff was manifestly correct.

Appellants' contention that "the trial court erred in failing to allow debtor setoff and counterclaim for a part of the $62,500 purchase price of Brando's 500 cattle which debtor borrowed and later repaid Denver National Bank under debtor's $192,222.68 chattel mortage note", is utterly lacking in merit. Contrary to appellants' assumption, Brando did not have the "primary obligation" to Denver Bank for the $62,500, nor did Judge Delehant so find. The lower court held that the obligation was primarily that of the debtor corporation, and that view is in conformity with the evidence. The offset was properly denied.

Judge Delehant did not allow any setoff for any portion of the $7,488.-90, asserted by Denver Bank (in claim No. 32) to be due and owing from debtor. Appellants insist that the setoff should be allowed "upon the ground that debtor is the third party beneficiary under the so-called 'extension agreement and guaranty' of May 27, 1952". This agreement and its import have been fully discussed, supra, in connection with claim No. 21. We agree with Judge Delehant that debtor is not entitled to the setoff.

APPEAL NO. 17,993

This appeal by Marlon Brando, Jr. is from:

(1) an order denying claim No. 22 secured status;

(2) an order denying allowance of appellants' claim No. 19, in the sum of $50,000;

(3) an order denying allowance of appellants' claim No. 20, in the amount of $17,500;

(4) an order allowing claim No. 12, as a general and unsecured claim, in favor of Roe R. Black, for one-half of $78,-641.75;

(5) an order allowing claim No. 13, as a general and unsecured claim, in favor of Thomas Hart Fisher, for one-half of $78,641.75.

We have already disposed of (1) (claim No. 22), and, therefore, pass to consideration of claim No. 19.

## CLAIM NO. 19

Here, Brando, Jr. seeks reversal of the order rejecting his claim of $50,000, the amount paid by him to Roe R. Black, in pursuance of a written contract, executed on July 26, 1950. The contracting parties were Marlon Brando, Jr. and Roe R. Black. There is no reference in the contract to Black Ranches, Inc. In essence, Black agreed to purchase, during the summer and fall of 1950 and prior to October 31, 1950, in the State of Texas, on behalf of appellant, 500 "Hereford heifer calves and bulls"; to finance acquisition costs; to ship them to Nebraska about May 1, 1951, and to furnish care in accordance with sound ranching practice. Black was to be paid $100 per head (a total of $50,000) for the services which he was obligated to furnish. Brando agreed to pay the $50,000 by depositing specified amounts on designated dates with National Bank of Commerce of San Antonio, Texas, escrowee. The escrowee was authorized to pay the amounts deposited to Black. The $50,000 was intended to fully compensate Black for his services in acquiring the livestock, arranging for financing, caring for them and providing feed, etc., until October 31, 1952, the termination date of the contract.

Although, as noted, Black Ranches was not a party to the contract, Brando, Jr. sought allowance of the claim against it on the pleaded theory that the contract was entered into by Black "on behalf of himself and debtor corporation, Black Ranches, Inc." Allegedly, Black "fraudulently failed to acquire the kind and quantity of cattle as and at the time required by said contract, and fraudulently failed and refused to furnish the care and feed for said cattle as required by said contract." The claim also averred that Black Ranches, through Black, on October 19, 1951, mortgaged all cattle purchased pursuant to the contract, to Denver Bank to secure its note for $192,222.68 (this transaction has been discussed, supra, in our disposition of claim No. 21); that the amount of the indebtedness and lien to Denver Bank far exceeded the authorized acquisition costs; that all cattle purchased under the contract were sold and the proceeds therefrom applied to indebtedness of Black Ranches to Denver Bank; that Brando, Jr. received no consideration for or benefit from the $50,000 paid by him. The evidence showed, and the court found, that Brando, Jr. had fully performed his contractual obligations.

Judge Delehant predicated denial of the claim upon his finding:

"that, to the execution of the agreement of July 26, 1950, only Marlon Brando, Jr. and Roe R. Black were parties; that the claimant's allegation that 'as deponent believes,' Roe R. Black executed that agreement in behalf of Black Ranches, Inc. is completely unsupported by the evidence. The language of the agreement itself is primary evidence upon the point. And, though with some dispute, there is evidence, which the court believes, that in approaching the execution of the contract, Marlon Brando signified his resolution to contract with Roe R. Black personally, rather than with Black Ranches, Inc. And that, as the court is persuaded, is the manner in which he actually—as well as apparently—did contract.

\* \* \* \* \* \*

"It is now simply found and concluded that no situation even remotely suggesting the fastening upon Black Ranches, Inc. of liability for any default by Roe R. Black under his contract of July 26, 1950 has been proved in this litigation. Black Ranches, Inc. was organized and still exists as a bona fide corporation. Its corporate existence has not been utilized or resorted to for the acquisition by Roe R. Black, or any one else, in relation to the transaction involved in Claim No. 19, of any advantage, unfair or otherwise, over Marlon Brando, Jr.

"The court, therefore, refuses to erect between Black Ranches, Inc. and Marlon Brando, Jr. a contract which Roe R. Black and Marlon Brando, Jr.

deliberately and understandingly refrained from making, and, having so erected it, to enforce it." [9]

Appellant invokes the principle that, where the corporation is a mere instrumentality of its owner, the corporation will be bound for its owner's acts and vice versa. Anderson, Limitation to Corporate Entity, § 247, p. 252; 1 Fletcher Cyclopedia, Corporations, § 42, p. 199; 18 Am.Jur.2d §§ 14, et seq.; Erickson-Hellekson-Vye Co. v. A. Wells Co., 217 Minn. 361, 15 N.W.2d 162, 173 (1944). Compare, Metropolitan Holding Co. v. Snyder, 79 F.2d 263, 103 A.L.R. 912 (8 Cir. 1935). In an effort to bring this case within the foregoing rule, appellant argues that the evidence shows that Roe R. Black's method of operation, involving the corporation's real estate and other assets, and his complicated manipulations, in connection with his far-flung cattle operations, "amounted to a scheme devised to defraud his cattle customers and others of vast sums of money, and that these facts bring him and his corporation, which he controlled at all times, within the rule that his debts and obligations are the debts and obligations of the corporation * * *." We have carefully weighed every facet of appellant's argument and being mindful that the legal principle which appellant invokes is to be applied with caution, and not precipitately, 18 Am.Jur.2d § 14, p. 560, we are not persuaded to hold that the evidence *compelled* the finding for which appellant contends. Judge Delehant, after a thorough analysis of the operative facts and the applicable law, reached a conclusion which we refuse to disturb. We, therefore, affirm the order disallowing claim No. 19.

## CLAIM NO. 20

Brando, Jr. predicates this claim upon an alleged indebtedness of $17,500. The historical facts are similar to those found in claim No. 19, supra, in that the claim has its inception in a written contract of August 8, 1951, between Brando, Jr. and Roe R. Black, to which Black Ranches is not a party and in which it is not mentioned. Black agreed to purchase 175 Hereford calves, arrange for financing, and furnish all feed and care for them, and for their progeny, until November 15, 1953. For faithful discharge of his obligations, Black was to, and did, receive the sum of $17,500 from Brando, Jr. The claim is premised on the alleged failure of Black to discharge his contractual obligations. As in claim No. 19, Brando, Jr. seeks to impose liability on debtor on the theory that the contract was entered into on the debtor's behalf and for its benefit. Judge Delehant disagreed and held that Black Ranches was neither directly nor beneficially a party to the contract. He disallowed the claim. For the reasons stated in our disposition of claim No. 19, we affirm the order of disallowance of claim No. 20.[10]

## CLAIMS NOS. 12 AND 13

Roe R. Black's original claim No. 12 alleged that Black Ranches was indebted to him in the sum of $50,502.89. Black's amended claim, filed pursuant to leave of court, increased the amount of the claim to $81,512.53. The alleged consideration for the amended claim was ranching equipment purchased by Black Ranches, Inc. from Roe R. Black, $7,750.-00; monies advanced to or for Black Ranches, Inc., $73,762.53, total $81,512.-53. Black further alleged that on February 7, 1956, he had assigned to Thomas Hart Fisher an undivided one-half in-

9. The court did not express an opinion on the question of whether the contract was breached by Black.

10. As noted by Judge Delehant there are similarities in the structure of the pleadings in claims Nos. 19 and 20, but post-contract evidence relating to claim No. 20 differed. Thus, cattle that were purchased under the August 8, 1951, contract were not involved in the Denver Bank financing. Furthermore, it does not appear that these cattle ever occupied Black Ranches. Judge Delehant did not reach the question whether Black defaulted in his engagements under the contract.

terest "in and to said debt against Black Ranches". The claim was allowed in the amount of $78,641.75.

Fisher's claim No. 13 constitutes a claim of ownership, through the assignment from Black, of the undivided one-half of the amount alleged to be due in claim No. 12.

Objections were filed to both claims by Marlon Brando and Marlon Brando Jr. With regard to claim No. 12, the objectors not only denied Black Ranches was indebted to Black but asserted that the converse was true; i.e., that Black was indebted to debtor. Objectors opposed Fisher's claim on the same grounds and also questioned the validity of the assignment, asserting, in this regard, that the assignment was not made in good faith "but is an attempt by * * * Thomas Hart Fisher to avoid and circumvent a former order by this Court refusing permission to said Thomas Hart Fisher to appear as an attorney for * * * Roe R. Black or any of the other parties in this proceeding * * *", and asserting further that the "purported purchase or assignment * * * is champertous".[11]

Appellant does not, in this appeal, renew these separate objections to Thomas Hart Fisher's claim. Rather, it is asserted that the Fisher claim, being merely an assigned portion of the Black claim, is subject to the same alleged infirmities which are here asserted against the Black claim.

Appellant's position here is couched in this language:

"Whether or not Roe Black actually expended the money he claims to have spent, is not the real issue here. * * The real basis of appellant's objec-

tions to the allowance * * * of these claims are, first, that as the 'alter ego' of the corporation, he cannot owe himself money; second, that in his management of the affairs of the corporation * * * Black used the assets for his own personal benefit and profit, and collected huge sums of money for the use of the corporate assets for which he has completely failed to account in this proceeding, with the result that he cannot in equity appear * * * claiming a right to share in the corporate assets along with all other general creditors."

After astutely analyzing the evidence bearing upon the claim and objections thereto, and in particular the ability of Black to have made the asserted advances, a defense apparently stressed in the trial court, Judge Delehant stated:

"On balance, the court considers that the evidence * * * supports the factual view that Roe R. Black, in the period under scrutiny, did have access to funds from which he could, and might, have made such advances. Undoubtedly much, almost certainly most, of them were gotten from borrowing * * *. But his making of the advances to which he testified, although perhaps indiscreet, is not, by the court, regarded as impossible or incredibly improbable".

The difficulty with appellant's position is that he failed to offer any evidence to refute Black's testimony in support of the claim. True, the overall picture lends support to appellant's hypothesis, but Judge Delehant was not sufficiently persuaded by such generalization to reject the claim. In the ab-

11. From the printed record and the original files, we are advised that, on February 2, 1955, Judge Delehant, in open court, denied an oral motion for the admission of Thomas Hart Fisher to practice "in this court for the purpose of this case only". On February 10, 1956, the court filed its written order, denying a "further and formal" motion for admission, in which the court found "that said motion [for admission] in the light of the attempted participation heretofore in this proceeding by the

said Thomas Hart Fisher and of the professional history and record in his own state of the said Thomas Hart Fisher, is not well taken and should be denied". In a 60-page typewritten opinion filed on October 10, 1958, directed to a motion filed by Fisher to disqualify Judge Delehant, on account of alleged bias and prejudice, the court elaborated upon Mr. Fisher's professional history in the State of Illinois.

sence of any counter evidence, and inasmuch as the court chose to credit Black's testimony, we should not interfere, particularly since we are not left with a firm feeling that a mistake has been made.

As we have seen, appellant now tacitly concedes the validity of Fisher's assignment. This concession obviates the necessity for consideration of this phase of claim No. 13. Since it rests on Black's claim, the allowance of which we affirm, we likewise affirm the court's order allowing claim No. 13.

Finally, there remains the question whether the district court erred in failing to subordinate the claims of Black, and his assignee, Fisher, to any and all claims against the debtor corporation, a contention which appellant vigorously urges upon us.

The premise for appellant's position is that the claim "does not represent legitimate corporate debt; it was, if anything, equity capital advance by the sole stockholder, who completely controlled the corporation, at a time when no other form of financing could have been obtained".

The district court, mindful of the applicable law, appraised "the plight of the claim which is before it", and found "[i]n respect of the claim, Roe R. Black is completely guiltless of fraud or overreaching as against the corporation, or as against its other creditors, or any of them. The reality of his rather far flung claim is convincingly established, despite some rather probable difficulty in the collection of the evidence in support of it. His advancements were made almost entirely for the operative needs of the corporation". Judge Delehant also was convinced that the evidence failed to establish appellant's contention that the advancements made by Black constituted capital contributions. In this regard, the court found that:

"In its inception, Roe R. Black's venture into the acquisition of the owned ranch land—and, as an ensuing consequence, the capital structure of Black

Ranches, Inc.—were certainly not liberally financed. Yet, as the enterprise was first envisioned, its financial position was not too straitened. Actual operating results eventually made its day by day cash position uncomfortably narrow. But that situation matured, and was recognized as an urgent problem during the spring of 1952, therefore, at the close of the period of many months, within which the items of Claim No. 12 were accumulating."

Having so found, the court concluded that claims Nos. 12 and 13 should be accorded a like position with the other general and unsecured claims, and entered an order accordingly.

The question whether an allowed claim should be subordinated to payment of other general creditors is, by its very nature, one that must be determined on an ad hoc basis. It is a question addressed to the conscience of the Judge sitting as a court of equity. Pepper v. Litton, supra, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

Concededly, Black and his wife were the owners of all of the stock of debtor corporation and he was a director, president and manager thereof during the time the advances were made to the corporation. But a major stockholder, director and managing officer is not, by virtue of that relationship, forbidden to contract with the corporation or to lend money to it. In the early case of Wyman v. Bowman, 127 F. 257, 273 (8 Cir. 1904), Judge Walter Sanborn laid down the rule in this language:

"Contracts and transactions between individuals and corporations of which they are directors or officers, which are fair, which are made in good faith, which do not secure to the individuals any undue or unjust benefit or advantage, and in which the interest of the individuals and the duty of the officials work in unison for the welfare of the corporation, are valid and enforce-

able both at law and in equity." (Citing cases).

The rule was recognized in Stuart v. Larson, 298 F. 223, 225–226 (8 Cir. 1924); in Goldstein v. Wolfson, 132 F.2d 624 (2 Cir. 1943), where the Second Circuit affirmed the district court which had rejected the contention that the advances by claimants were properly to be considered as capital contributions. See also, In re Madelaine, Inc., 164 F.2d 419 (2 Cir. 1947).

Although appellant apparently recognizes the principle enunciated in the above authorities, his position obviously is that it has no application here. He rests his contention upon Boyum v. Johnson, 127 F.2d 491 (8 Cir. 1942); Oleck, Modern Corporation Law, § 194, p. 486, § 195, pp. 486–488; Taylor v. Standard Gas & Elec. Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939); Gannett Co. v. Larry, 221 F.2d 269, 51 A.L.R.2d 980 (2 Cir. 1955). The ultimate decisions in the cases cited by appellant are favorable to him, but the cases are not controlling because of distinguishing factual differences. In Boyum v. Johnson, supra, said to be "exactly in point", Judge Johnsen pointed out that Boyum's "general dealings with the corporation were not on the arm's length plane of the other creditors." Ibid. 127 F.2d 494.

 Our view of the evidence on the subordination issue, in light of the entire factual picture, satisfies us that Judge Delehant properly accorded Black's claim a like position with the other general and unsecured claims. In the final analysis, we perceive of no vital difference between the position occupied by Black, when his advancements were being made, and the status of Brando, Jr. during the period of time the debtor corporation borrowed funds, through Brando, from Brando, Jr. Thus, the argument appellant makes could, with equal force, be made in regard to the claims allowed in his favor.

In conclusion, the various orders and rulings appealed from are in all respects affirmed.